THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JACKIE TURNER, Defendant-Appellant.

First District (1st Division)    No. 60893

Opinion filed December 12, 1977.

Ralph Ruebner and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Jackie Turner, was charged with armed robbery and aggravated kidnapping. After a bench trial, defendant was convicted of both offenses and sentenced to concurrent terms of 7 to 21 years in the penitentiary. He appeals, contending that (1) his right to a speedy trial pursuant to the Fourth Term Act Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1973, ch. 38, par. 103—5) was infringed and (2) he was not proved guilty beyond a reasonable doubt.

With reference to defendant's first contention, the record discloses: Defendant was arrested on November 25, 1972. On January 9, 1973, he was indicted for armed robbery and aggravated kidnapping. He demanded trial on those charges on February 8, 1973. Defendant posted bond and was released from custody on March 5, 1973. An indictment for bail jumping on a charge unrelated to the armed robbery and aggravated kidnapping charges was returned on March 9, 1973. On April 19, 1973, defendant demanded trial on that charge and the other charges. Defendant's trial for bail jumping commenced on April 26, 1973. He was found guilty on May 3, 1973, and was sentenced on June 15, 1973. Defendant agreed to a continuance of the trial on the armed robbery and aggravated kidnapping charges until October 9, 1973. He filed his motion for discharge on October 26, 1973, alleging that more than 160 days had elapsed since his arrest and indictment.

Section 103—5(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(e)) provides in applicable part:

> "(e) If a person is simultaneously in custody upon more than one charge pending against him in the same county, or simultaneously demands trial upon more than one charge pending against him in the same county, he shall be tried, or adjudged guilty after waiver of trial, upon at least one such charge before expiration relative to any of such pending charges of the period prescribed by subparagraphs (a) and (b) of this Section. Such person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which judgment relative to the first charge thus prosecuted is rendered pursuant to Section 118—1 of this Act

* * *; if either such period of 160 days expires without the commencement of trial of, or adjudication of guilty after waiver of trial of, any of such remaining charges thus pending, such charge or charges shall be dismissed and barred for want of prosecution unless delay is occasioned by the defendant, * * *."

■■ Defendant simultaneously was demanding trial on the bail jumping and the armed robbery and aggravated kidnapping indictments as of April 19, 1973. He was on bond at that time; consequently, the State had 160 days to try defendant. (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(b).) According to the provisions of section 103—5(e) (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(e)), the State was required to try defendant on at least one of the pending charges within 160 days of his arrest. Defendant's trial for bail jumping began 152 days after his arrest. The State is also required to try all of the remaining charges within 160 days of the judgment on the first charge. (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(e).) Defendant's motion for discharge on the armed robbery and aggravated kidnapping indictments was filed on October 26, 1973. The date of judgment on the first charge is the date of sentencing, June 15, 1973. (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(e); *People v. Martin* (1976), 44 Ill. App. 3d 207, 358 N.E.2d 106.) However, defendant broke the term by agreeing to a continuance on September 24, 1973. (*People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776.) The term began to run anew on October 9, 1973, the continued date to which defendant had consented. (*People v. Partee* (1974), 17 Ill. App. 3d 166, 308 N.E.2d 18.) The trial on the armed robbery and aggravated kidnapping charges began on January 17, 1974. This was within 160 days of October 9, 1973. When defendant's motion for discharge was filed on October 26, 1973, his right to a speedy trial had not been violated. His motion was properly denied.

Defendant's reliance on *People v. King* (1972), 8 Ill. App. 3d 2, 288 N.E.2d 672, is misplaced. That case was decided on an application of section 3—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 3—3), which was concerned with multiple charges arising out of the same act. Defendant's charge of bail jumping did not arise out of the same act as the armed robbery and aggravated kidnapping charges.

With reference to defendant's contention that he was not found guilty beyond a reasonable doubt, the record shows: On August 3, 1972, at about 9 p.m., Charles F. Moore left his office at 352 East 87th Street in Chicago and walked across the street to his automobile. He saw a black man about 5'6″ tall, weighing about 150 pounds, standing behind a cleaner's building near his car. The man walked around Moore. Moore turned to face him and asked the man what he wanted. The man mumbled something. When he got within 15 feet of Moore, he pulled a revolver from under his coat. The man told Moore to stand there, don't say anything and don't run.

Two men came up behind Moore. A tall man put an automatic pistol to Moore's head. The tall man told Moore to get into the car and sit on the back seat. The tall man took Moore's watch and his wallet containing $300. The men told him if he didn't cooperate they would blow his brains out. Moore lay down on the floor of the back seat of the car. His hands were tied behind his back, his feet were tied together and tape was put over his eyes.

Moore was driven to a building and carried upstairs. During the drive, he was told the men wanted $15,000 or he would be killed. Later, still blindfolded, he was taken out and driven to a telephone. Many cars were passing the telephone. Someone dialed his home telephone number and Moore spoke to his wife and told her he would not be home that night. While he was being driven from the telephone to another building, two sets of feet were on his back while he was lying on the floor of the back seat of the car. He was taken to a place with high grass and was carried into a building and down some stairs. He was tied to a post in the middle of a room. During the night he pretended to faint, but the tall man put water in Moore's mouth and nose and told him, "don't ever try that trick on me no more." The next morning Moore told the men he could get them the money by having his wife get a check for $15,000 from his secretary. He was taken to a phone and spoke to his wife and secretary about the check. His wife was to cash the check and leave the money in small bills in a bag at 81st Street and Ingleside. After the telephone call, he was put in a different car in a garage. Later he was able to burn the ropes on his wrists and escape from the garage. He ran to a house and called the police. When the police arrived, he led them to the garage behind 8730 South Union Avenue, Chicago, where he had been kept. Later he was able to recognize 8730 South Union as the house where he had been held captive.

Hazel Thomas, Moore's secretary, made out a check for $15,000 and gave it to Mrs. Moore on August 4, 1972. Loretta Moore, the victim's wife, presented the check at the Independence Bank of Chicago and received a paper bag filled with small bills. Mrs. Moore, in the company of an agent of the Federal Bureau of Investigation, dropped the bag at 81st Street and Ingleside Avenue, in Chicago.

Officer Gene Harris of the Chicago Police Department testified he went to 8748 South Union in response to a radio call and there saw Mr. Moore, who had burnt rope and tape on his wrists and was barefoot. Moore led him to a garage at 8730 South Union, which contained Moore's late-model Cadillac and which Moore said was the place from which he had escaped. Officer Harris found a Richard's Wild Irish Rose wine bottle on a countertop in the house.

John Olezniczak, an employee of the Chicago Police Department Crime Laboratory, a qualified expert in fingerprint identification, stated

that in his opinion, based on a comparison of the latent fingerprint from the wine bottle found at 8730 South Union and the known fingerprint of defendant, that the fingerprint on the wine bottle was defendant's.

Nebooker Nevels, a co-defendant, testified that he had known defendant for more than 8 years. On August 3, 1972, defendant came to Nevels' house at about 2 p.m., accompanied by Brenda Cole and James Nevels. Defendant told him about abducting a Mr. Moore at his office on 87th Street. They would get $15,000 ransom. Turner gave him a .38-caliber pistol, but kept his own .45-caliber pistol. They all went to Cole's apartment and then to a hardware store to buy tape. Turner told him he would wait for Moore in front of a cleaner's store across from Moore's office, while defendant and James Nevels waited behind the cleaner's.

They parked their car across from Moore's office. At 10 p.m., Moore left his office and went to his parked car. Nebooker Nevels followed Moore to his car. When Moore turned toward Nebooker Nevels, defendant and James Nevels encircled him. Defendant told Moore to be cool and pulled his .45-caliber pistol. Turner shoved Moore into the back seat of Moore's car and put tape over his eyes and around his wrists. They drove to a telephone at 39th Street and Lake Shore Drive, where Moore told his wife he would not be home that night. After they took the victim to defendant's apartment, they took Moore to 8730 South Union and carried him into the basement. Nebooker Nevels saw defendant slap Moore in the face. They tied Moore to a post in the floor. That night Nebooker Nevels went out and brought back some wine, which he, Turner and James Nevels drank. In the morning of August 4, 1972, they drove Moore to the telephone he had used the previous night. Moore instructed his secretary to draw a check for $15,000 and give it to his wife. Mrs. Moore was told to cash the check and leave the money in small bills at 81st and Ingleside in a paper bag. After the call, they put Moore in his own car in the garage at 8730 South Union. Later that morning, Nebooker Nevels went back to the garage and discovered that Moore had escaped.

Brenda Cole, a co-defendant, testified that prior to August 3, 1972, defendant had asked her about Mr. Moore, his business and his personal life. On that afternoon, she, James Nevels and defendant went to Nebooker Nevels' house. Defendant was much taller than James and Nebooker Nevels. All of them drove past Moore's office and had a conversation about Moore. They went to Brenda Cole's apartment, where the men talked in her kitchen. She gave defendant his .45 and the keys to her uncle's car. That night she saw Moore lying in the back seat of his car. She was driven in Moore's car to pick up her uncle's car on 87th Street. When she arrived at 8730 South Union, she saw Moore tied to a post on the basement floor. On August 4, 1972, she left 8730 South Union to watch Mrs. Moore get the check and go to the Independence Bank. Cole went to

81st and Ingleside, but left because there were too many detective cars around.

For the defense, Jeanne Williams, defendant's former wife, testified that on August 4, 1972, defendant was with her at 4444 North Sheridan Road, Chicago, from 2:30 a.m. until 9 a.m. Then they went to defendant's mother's house on South Sangamon in Chicago, where they remained until 6 p.m. Defendant was arrested at her apartment.

Jackie Turner testified in his own defense. He stated that on August 3, 1972, he saw James and Nebooker Nevels but only in the afternoon at a pool hall. He bought them a bottle of wine. From about 7 p.m. to 1 a.m., he was at his sister's house, playing cards with a group of people. When he left her house, Kenneth Grizzard dropped him at the Chicago Transit Authority station at 95th Street and the Dan Ryan Expressway. He rode the elevated train to the Loop and to the stop nearest his former wife's apartment, where he stayed until they went to his mother's house on the morning of August 4. Defendant denied seeing Brenda Cole or Charles Moore on August 3, 1972. After he saw James and Nebooker Nevels at the pool hall, he did not see them again on that date. He never drove the victim's car; nor did he own a .45-caliber pistol.

Geraldine Hughes, defendant's mother, testified that defendant was at her house from 11 a.m. to 7 p.m. on August 4, 1972. When she had been interviewed by an investigator for the State's Attorney's office prior to her testimony, she said she did not remember where defendant was on August 4, 1972.

Kenneth Grizzard, a friend of defendant, testified that he played cards with defendant at defendant's sister's house on August 3, 1972. He remembered the date because defendant's sister and her family brought it to his attention.

Aretcha Cooper, defendant's sister, stated that she saw defendant at Billie Mott's house on August 3, 1972. When questioned by a State's Attorney's investigator before she testified, she "funned" with him when she told him she did not remember August 3, 1972. She only "funned" about things she did not wish to disclose to the investigator.

Billie Mott, defendant's sister, testified that defendant played cards at her house on August 3, 1972.

In rebuttal, James Duffy, also known as James Nevels, testified that he did not play pool with defendant at any time on August 3, 1972. On August 4, 1972, from 1 a.m. to 7 a.m., he was with defendant and they were not at Jeanne Williams' apartment at 4444 North Sheridan Road. He did go to defendant's mother's house on August 4, 1972. He and defendant got there about 1:15 p.m. and stayed a short while.

■■ ■ Defendant contends he was not proved guilty beyond a reasonable doubt because the State's case consisted mainly of accomplice

testimony, which is inherently suspect. Accomplice testimony, standing alone, may be sufficient to convict. (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291; *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) In this case, the accomplice testimony was corroborated in many details by other testimony, including that of the victim. This court will not substitute its judgment for that of the trier of fact because there is conflicting evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) The trier of fact is not bound to accept defendant's exculpatory evidence. (*People v. Warren* (1965), 33 Ill. 2d 168, 210 N.E.2d 507.) On this record, the defendant was proved guilty beyond a reasonable doubt.

Judgment affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.